———————————————————————————x

FEDERAL TREASURY ENTERPRISE : 
SOJUZPLODOIMPORT and OAO "MOSCOW : 
DISTILLERY CRYSTALL," 

    :

       Plaintiffs,                      No. 14 Civ. 712 (Stein, J.)

    :

       -against-

                               AMENDED
SPIRITS INTERNATIONAL B.V., FORMERLY:    OPINION AND ORDER
KNOWN AS SPIRITS INTERNATIONAL, N.V.;
SPI SPIRITS LIMITED; SPI GROUP SA; YURI  :
SHEFLER; ALEXEY OLIYNIK; WILLIAM
GRANT & SONS USA; WILLIAM GRANT &  :
SONS, INC.; STOLI GROUP (USA) LLC and
IP AMERICAS SARL,                   :

       Defendants.               :

———————————————————————————x

       This Amended Opinion and Order supercedes and replaces, in its entirety, the Opinion and Order filed on November 3, 2017. Defendants SPI International B.V., and related parties ("SPI); and William Grant & Sons USA, and related parties ("Grant") (together, "Defendants") move to compel Plaintiffs ("FTE") to collect and produce documents held by the Russian Federation government that are responsive to Defendants' Requests for the Production of Documents (the "Requests"). Defendant Grant moves as to each of its three separate sets of document requests and also seeks an order requiring FTE to certify that no responsive documents exist if none are found as to any particular request. Defendants also move to stay all discovery, pending resolution of the motion to compel and, if granted, production of all documents called for by the Requests.

       FTE vigorously opposes both motions, for reasons set forth more fully below.

       In connection with this motion, the Parties have submitted voluminous papers, including opinions on Russian law by acknowledged experts, on behalf of both FTE and SPI.  In addition,

after oral argument, I requested special briefing on a specific factual and legal question that I deemed essential to the determination of these motions. Both sets of Parties submitted additional memoranda of law, supplemental declarations, and supplemental exhibits.

For reasons stated, the motions by Defendants SPI and Grant to compel are granted as to certain designated entities and agencies of the Russian Federation and denied as to others; and the motions to stay are granted, pending production by FTE of all documents called for by the Requests from the designated entities and agencies. If no responsive documents are found with respect to any of the Defendants' Requests, FTE is directed to certify that no responsive documents exist.

BACKGROUND

This case was brought by FTE pursuant to an Executive Order signed by President Vladimir Putin on March 13, 2000 ("Putin Order" or "Order") (Exhibit 3 to Declaration of Keith Hummel, dated June 1, 2017). The Order authorizes "measures directed to restoration and protection of *the rights of the state* concerning intellectual property in the sphere of production and turnover of vodka products, and also for detection and bringing to account of the persons involved in violation of these rights. *Report on the results monthly*" (emphasis added).

On July 6, 2001, a Resolution was adopted "[f]or the purpose of taking emergency measures for protecting, restituting and exercising the exclusive rights of the Russian Federation to trade marks for alcoholic and spirituous drinks…" Declaration of Mikhail Tsyplakov (Tsyplakov Declaration), ¶54, Exhibit 42. The Government of the Russian Federation (i) granted the right of possession in the name of the Russian Federation of trade marks for alcoholic drinks to the Ministry of Agriculture, (ii) charged the Ministry of Agriculture, the Ministry of Property Relations of the Russian Federation and the Russian agency on patents and trade marks to "ensure…that the measures aimed at the protection and restitution of the exclusive rights of the Russian Federation to trade marks for alcoholic and spirituous drinks will be taken," and (iii) appointed an "interdepartmental working group…for the purposes of resolving the questions of …*restitution of the exclusive rights of the Russian Federation* to trade marks for alcoholic and spirituous drinks…" (Emphasis added), Id.

The members of the working group were nine representatives of Russian Federation Ministries and Departments, including the Deputy Minister of Agriculture as head of the working group, the Assistant Vice-Chairman of the Government of the Russian Federation, and the Deputy Minister of Property Relations of the Russian Federation.

In December 2001, FTE was formed by the Russian Federation, (Comp. ¶7 (Dkt.2), see also Expert Report of Olga Krivelskaya, ¶22 ("FDTE was created in 2001to perform the commercial activities of the former Soviet state enterprise VVO-SPI."). On March 11, 2002, FTE was chartered with the explicit purpose to "protect and restore the rights of the Russian Federation to its alcohol trademarks abroad…" Declaration of Charles Munn (Munn

2

Declaration), Exhibit 3. The charter entitles FTE to "protect[ ] and restor[e] ... the Russian manufacturers' violated rights to trade marks of any products." See discussion in *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 68 (2d Cir. 2013) ("FTE II"). FTE is a so-called "unitary enterprise" with one shareholder, the Russian Federation, and can only be owned by the Russian Federation. A "strategy was developed for restoration of the Russian Federation's rights to trademarks abroad, approved by the Deputy Prime Minister of the Russian Federation…" Id.

As part of that strategy, an analysis was undertaken to determine how "the rights of the Russian Federation to the Stolichnaya trademark could …be restored…" It was determined by FTE and its US lawyers that the "only" way such "rights…could be…restored" was "through the courts" by FTE's bringing an action in the United States. Id.

The litigation referred to was commenced and, after motions, the litigation was dismissed on procedural grounds, with the District Court finding that the grant to FTE was inadequate for Lanham Act standing purposes, because a trademark assignment requires the "sale or transfer of all rights in the mark." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, No. 04 Civ. 0851, 2011 WL 4005321, at *6–7 (S.D.N.Y. Sept. 1, 2011) ("FTE I").

On appeal, the Court of Appeals for the Second Circuit also found that FTE lacked standing to sue for trademark infringement: "A clear writing effecting an assignment signals to the parties and the world that the assign is the party that owns the mark and is authorized to exclude others from use. There is no such writing in the record before us, nor is such a writing adequately alleged in the complaint." *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 74 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1291(2014) ("FTE II").

There followed extensive discussions within the Russian Federation as to how to continue pursuing the objective set forth in the Putin Order. On February 1, 2014, the Russian Federation issued Decree 69, authorizing the Federal Agency for Property Management to transfer to FTE "the rights of the Russian Federation" in the Stolichnaya trademarks for the United States. Pursuant to the Decree, an assignment was executed (the "Assignment"), transferring the Russian Federation's "entire right, title, and interest in and to the [Marks]" to FTE. Supplemental Declaration of Jessica Rose, ¶¶2-3 and Exhibits A and B thereto [Document 234].

Specifically, the Assignment provides, in relevant part, as follows:

WHEREAS, Assignor ["the Federal Agency on State Property Management, a federal state executive body of the Russian Federation"] and Assignee desire to clarify and ensure beyond any doubt that Assignee has and will by this instrument have good title to the Trademark in the U.S., to the extent that such title conceivably might not have been previously conveyed to it;

NOW, THEREFORE, … Assignor hereby

1. Sells, conveys, transfers, assigns and sets over its entire right, title and interest in and to the Trademarks in the U.S…Assignor expressly relinquishes any and all right, title, and interest in and to the Trademarks in the U.S….
   ***
4. Sells, conveys, transfers, assigns and sets over the right to sue and collect damages for past, present and future infringements, … including the claims that Assignee has attempted to bring in the United States District Court for the Southern District of New York against [the Parties herein].

*Id.*, Exhibit B.

FTE then filed the present lawsuit, once again asserting both section 32(1) and non-section 32(1) claims against SPI. FTE's standing to bring the claims was again challenged. The challenge was eventually rejected and the standing of FTE to bring this action upheld by the Court of Appeals for the Second Circuit. *Federal Treasury Enterprise Sojuzplodoimport v. Spirits Intern. B.V.*, 809 F.3d 737 (2d Cir.), *cert. denied*, 137 S. Ct. 160 (2016) ("FTE III"). The Court found that the prior inadequate assignment had been cured by the Russian Federation having, on this occasion, "effected a valid assignment…[so] FTE could sue under Section 32(1) as an 'assign.'" *FTE II*, 79. Further, the Court found that "The Assignment effectuates a transfer of rights to pursue claims from the foreign sovereign, the Russian Federation, to *one of its instrumentalities, FTE*, pursuant to a governmental act, the Decree." *FTE III*, 745. (emphasis added).

On September 8, 2016, in a hearing before the Honorable Sidney Stein, Defendants sought leave under the Court's rules to make a motion to compel FTE to produce document in the possession of the Russian Federation. At the hearing, FTE offered, and the Court accepted, over SPI's objection, a proposal to seek the "voluntary" production of such documents from the Russian Federation.  SPI gave to FTE the names of twenty-seven agencies within the Russian Federation that were likely to have responsive documents.

On November 9, 2016, the Court appointed me as Special Master to resolve all discovery matters.  On December 6, 2016, after a hearing, I ordered FTE to request that the Russian Federation agencies, previously identified, search for responsive documents. Between late 2016 and the present, FTE, through its counsel, has reported biweekly to me on its progress in securing such voluntary production.  To date, fourteen of the twenty-seven agencies have produced documents, and a total of approximately 3400 pages of documents has been produced.

MOTION TO COMPEL

Summary Of Arguments

Defendants argue that the production of documents has been meager from those agencies that responded and has been non-existent from several agencies that logic suggests ought to have had such documents; Defendants contend that the attempt to secure documents on a voluntary

basis has been a failure and urges an inference that other documents do exist and should be produced.

Further, Defendants argue that FTE, as a unitary enterprise under Russian Federation law, holds the Stolichnaya Trademark in a form of ownership known as "operative management," and further that because the Russian Federation, in its sole discretion, control the existence of FTE and the disposition of all property held by FTE, the Russian Federation retains an interest in the Stolichnaya trademark, such that the U.S. Courts have the ability to compel FTE to seek discovery from all entities within the Russian Federation that may reasonably be believed maintain documents related to this controversy.

FTE argues, correctly, that the party moving to compel bears the burden of showing that (1) there are undisclosed documents responsive to its requests; (2) FTE has possession, custody, and control of those documents; and (3) the documents are relevant to the parties' claims and defenses and proportional to the needs of the case. *Neogenix Oncology, Inc. v. Gordon*, 2017 WL 1207558, at \*10 (E.D.N.Y. 2017); *U.S. v. Novartis Pharmaceuticals Corp.*, 2014 WL 6655703, at \*3 (S.D.N.Y. 2014).

FTE points out that it vigorously sought discovery on a voluntary basis from every agency SPI had identified, corresponded frequently with each agency, and reported biweekly as to every document request. FTE contends that not a single specific responsive document has been identified as undisclosed, that there has been no showing of any deficiency in FTE's extensive efforts to secure voluntary disclosure, and, most importantly, there is no evidence that there are in fact any other undisclosed documents throughout the government. More basically, FTE argues that, by making the argument that FTE held the Trademark only in a state of "operative management" and did not have complete ownership rights in the Trademarks, and that the Russian Federation retained some ownership interest in the Trademarks, Defendants are, essentially, arguing that the Russian Federation violated Russian law in making the Assignment, and that, by reason of the Second Circuit's decision in *FTE III*, such issues are barred by the law of the case doctrine. *Arizona v. California*, 460 U.S. 605, 618 (1983).

I address these arguments below.

1. <u>There Are Undisclosed Responsive Documents</u>

Notwithstanding FTE's factually correct arguments about its and its counsel's significant efforts to obtain voluntary production of all relevant documents, I find that SPI has made a sufficient showing to support a strong inference that there are undisclosed documents in certain agencies of the Russian Federation.

First, the Putin Order directed that monthly reports be provided to the President regarding the progress being made to restore the rights of the Russian Federation to the trademarks. No such reports to the President have been produced; nor have any documents relating to such

monthly reports been produced from the President of the Russian Federation, the Administration of the President, the Russian Federation Government, or the Apparatus (Executive Office) of the Russian Federation, among many others, which were to be intimately involved in the restoration process.[1]

With respect to the issue of maintenance of documents within the Russian Federation, there was expert opinion offered by FTE and SPI of noted experts in Russian administrative law, pursuant to Fed. R. Civ. P. 44.1, regarding the structure of governmental agencies within the Russian Federation and the obligations of such governmental offices to maintain documents.[2]

On behalf of FTE, Professor Krivalskaya provided an overview of the Russian Federal System and State Enterprises. She opined that FTE was created to perform the commercial activities of the former Soviet state enterprise VVO-SPI and was "first supervised by the Ministry of Agriculture, but is now supervised by the Federal Service for Regulation of the Alcohol Market ("Rosalcohol") and the Federal Agency for the Management of State Property." The latter is subordinated to the Ministry of Economic Development of the Russian Federation, while Rosalcohol is subordinated to the Ministry of Finance of the Russian Federation. The head of Rosalcohol is appointed and can be dismissed by the Government at the nomination of the Minister of Finance. Krivalskaya Expert Report ¶¶6, 10, 22

Professor Krivalskaya also explained that FTE is a federal state unitary enterprise, which "may not dispose of their assets without consent of their founder." There is nothing in any of the statutory grants of authority to such unitary enterprises, such as FTE, "that would allow them to compel Russian state authorities to commit any type of acts, including disclosing documents or information." Further, the Charter of FTI does not grant to FTE any power that would allow it to compel the Russian state authorities to disclose any relevant documents of information." Id. at ¶¶17, 18, 21, and 25.

As part of her Expert Report, she summarized the law regarding document retention and production practices by various Russian entities. She opined that the President of the Russian Federation is not responsible for maintaining documents, but rather they are "processed and maintained by the Administration of the President…", ¶63. "Similarly, the Government of the Russian Federation does not store documents," but rather "a special department of the Apparatus

---

[1] As reported by Jessica Rose, Esq., one of the attorneys for FTE, the Administration of the President produced 38 pages of responsive material and certified that it found no other responsive documents. Declaration ¶10, Ex. GG at 1.

[2] Dr. Olga Krivelskaya, an attorney qualified to practice law in the Russian Federation and a professor at Moscow State University for International Relations, submitted an Expert Report for FTE, filed July 13, 2017. Dr. Ilya Rachkov, an attorney qualified to practice law in the Russian Federation and an expert in Russian legal issues and litigation procedures, a frequent expert on Russian law in cases in England and the United States, submitted an Expert Report, dated August 3, 2017, commenting on Professor Krivelskaya's Report and opining on similar issues.

is designated to provide administrative and technical support to the Government, which includes … maintaining of documents…" Id. at ¶64.

Professor Krivalskaya concluded her opinion by stating that "Russian laws and instruments do not provide for Rosalcohol, Ministry of State Property and federal state unitary enterprises (such as FTE) to be entitled to control documents maintained by the Administration of the President or the Apparatus of the Government of the Russian Federation. Accordingly, there is no legal or practical basis for entities or ministries such as Rosalcohol, the Federal Agency for the Management of State Property or FTE to control such documents." Id. at 65.

On behalf of SPI, Dr. Rachkov was asked to opine about the law concerning the "retention of documents related to orders or instructions of the RF president." Rakov Expert Report ¶29. He cited the "List of Standard Administrative Archival Documents Formed in the Process of Activity of State Authorities", approved by Order No. 558 of the Ministry of Culture of the Russian Federation, dated August 25, 2010 (the "List"), approved by Order No. 558 of the Ministry of Culture of the Russian Federation, dated August 25, 2010, at Annex B of his Expert Report. The List specifically provides, in relevant part, that "All legal and other normative acts (decrees and resolutions), orders of the Russian Federation…shall be kept – permanently in the place of their formation and approval…" and further provides that "Instructions of the President of the Russian Federation Government and other federal and regional authorities; documents (reviews, reports, calculations, opinions, statements) concerning their fulfillment shall be kept permanently…" Rachkov Expert Report, ¶29-31.

It would appear from the report of Professor Krivelskaya that there should have been more documents of relevance, such as the periodic reports mandated by the President, in the files of the Apparatus or the Administration of the President. However, as stated, no such documents were produced. Further, there is no discussion in Professor Krivelskaya's report regarding the failure of the Administration of the President or the Apparatus to produce documents. I find that the record regarding the retention, or lack thereof, of documents supports the strong inference that it is highly likely that there are responsive documents in the Office of the President of the Russian Federation, the Russian Federation Government, and the Apparatus (Executive Office) of the Russian Federation.

Second, only sixteen pages of documents were produced by the Ministry of Agriculture. This is notwithstanding the fact that the Ministry of Agriculture was charged with "ensur[ing]… that the measures aimed at the protection and restitution of the exclusive rights of the Russian Federation to trade marks for alcoholic and spirituous drinks will be taken…" There is no discussion in the Report of Professor Krivelskaya regarding retention rules regarding the Ministry of Agriculture, but she does opine that the "Ministry of Agriculture is a federal executive body" and, thus, it appears that the Ministry of Agriculture should have permanently maintained records and documents relating to its role with FTE. Rachkov Expert Report ¶¶29-31. Again, there is a strong inference that relevant documents should exist in the files of the Ministry of Agriculture.

This is sufficient evidence to support an inference that documents do exist in the Russian Federation that are likely to be responsive.

2.  FTE Has Possession, Custody and Control of Responsive Documents

SPI and Grant urge three theories in support of their positions that the motions to compel the Russian Federation to produce documents should be granted:

1. FTE is an agency of the Russian Federation
2. As an assignee of the purported rights of the Russian Federation, FTE must produce the same documents and information as would have been produced if the assignor had brought the claim itself; and
3. FTE has the practical ability to obtain documents from the Russian Federation.

In support of those theories, Defendants assert the following as facts, and it appears from review of the extensive record that FTE does not contest any of them:

• The case was filed in accordance with the directions given in the Putin Order;
• FTE is a special type of business entity that can be owned only by the Russian Federation.
• FTE was created by the Russian Federation as part of its efforts to execute the Putin Order.
• The Russian Federation exercises, through its other agencies, supervisory control over FTE.
• FTE has admitted that it is an "agency" of the Russian Federation and the Russian Federation has declared that FTE was created for the purpose of representing its interests in "recovering" the Stolichnaya trademarks.[3]
• To the extent that FTE has any rights at all in the disputed trademarks, it cannot assign those rights without the Russian Federation's permission.
• The Russian Federation, as the sole shareholder of FTE, can dissolve it at any time and absorb all of the assets of FTE.

Thus, at its core, Defendants' arguments in support of each of the three theories are that the Russian Federation controls, directs and is the moving force behind this litigation. In so arguing, SPI places great emphasis on *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y. 1984).

_____

[3] In the litigation in the District and Circuit Courts following the Assignment, FTE described itself as a "Russian government agency," "a Russian government instrumentality," and "an agency of the Russian Federation." See FTE's Opp'n to SPI's Mot. To Stay Mandate, *FTE v. SPI Int'l B.V.*, No. 15-152 (2d Cir.), Dkt. 144 at 1, 5, 6.

In *Compagnie Francaise*, the Court addressed the issue of whether a Rule 34 request for the production of documents held by two non-party French ministries was unenforceable where the request was directed to a plaintiff, which was another agency of the French Government, notwithstanding the fact that the plaintiff was not in possession, custody or control of the requested materials. Id. at 32. The Court observed that "a third party with a substantial interest in the litigation cannot be allowed to frustrate the rules of discovery to the disadvantage of a party." Id. at 34. Further, the Court considered the fact that, similar to here, the French government stood to receive any award the plaintiff may obtain in this action, to be "a substantial interest in the litigation…"

The Court also relied on *In re Uranium Antitrust Litigation*, 480 F. Supp. at 1145 ("issue of control ... rests on a determination of whether the defendant has practical and actual managerial control over, or shares such control with, its affiliate regardless of the formalities of corporate organization") and *Ghana Supply Commission v. New England Power Co.*, 83 F.R.D. 586 (D.Mass.1979). In *Ghana Supply*, a government-sponsored Ghanian corporation sued an American company to recover the unpaid portion of the sales price of fuel oil refined in Ghana and sold by the plaintiff to an oil merchant and ultimately resold to the defendant. Id. at 587, 591. Defendant served a Rule 34 document request seeking certain records of a Committee of Inquiry established by the Ghanian government to investigate "in camera" the facts surrounding the fuel oil sales. Id. at 587–88. The Republic of Ghana, not formally a party to the lawsuit, interposed a claim of executive privilege seeking to withhold Committee documents. Id. at 588. On defendant's motion to compel production, the Court held that the GSC was required to produce the withheld documents from the Ghanian government. The Court found that the plaintiff was an agent of the Ghanian government for purposes of the lawsuit. Id. at 592. In reaching this conclusion, the Court in *Ghana Supply* relied on the fact—as in *Compaignie* and similar to the facts here, that the Ghanian government was the principal of the plaintiff, id. at 591, and any recovery of damages would benefit the Ghanian treasury, id. at 592 n. 5.

In opposition, FTE's position is that, first and foremost, even if the seven, seemingly uncontested, facts are true, such facts do not and cannot mean that FTE "controls" the production of documents from other agencies within the Russian Federation or, indeed, from the Russian Federation itself. FTE argues that the "control" theory, as expressed in *Compagnie Francaise*, *supra*, is dicta that has been rejected by many courts around the country and that its theory of "monolithic" government has specifically been rejected as imposing a crushing burden on government, *US v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1971), *Dept. of Economic Development v. Arthur Andersen & Co. (U.S.A.)*, 139 F.3d 295 (S.D.N.Y. 1991).

These cases are simply inapposite to the issues presented here. In *Avellino*, the defendant sought to attribute constructive knowledge to a federal prosecutor of allegedly exculpatory evidence gathered in an earlier State investigation. The Court did not reach the issue of attribution because of the lower court's finding that, even if attributable, the information was not material. Id. at 256. In *Dept. of Economic Development*, the defendant Arthur Andersen & Co. (U.S.A.) sought production of files of the London Metropolitan Police Force ("MPF") relating to

its October 1981 investigation of allegations of financial wrongdoing by DeLorean. Plaintiff DED, an entity created by the British Government, argued that the MPF is not a department or agency of the British Government, its files are not subject to the control of DED and therefore DED cannot be required to produce these documents. The Court found that, as a factual matter, unlike the situation presented here, the MPF is "significantly independent from the British Government." Furthermore, the Court stated that the information Arthur Andersen sought from the MPF is "available from other sources." Id. at 300-301.

Secondly, FTE argues that the so-called "moving force" doctrine — that the Russian Federation is essentially the puppet master and FTE the puppet — is not supported by the cases cited by SPI. FTE contends that the Russian Federation "as an amorphous whole" does not control FTE, and that the "Russian Federation's interests in FTE are exercised *almost exclusively* by its two supervisory agencies, Rosalcohol and the Federal Agency for State Property Management" (emphasis added), FTE Supplemental Memorandum of Law at 5.

But the "moving force" argument, as described by FTE, that "FTE can be deemed to control documents from every ministry, agency, and governmental entity in the Russian Federation,", FTE Memorandum in Opposition to Motion to Compel (FTE Mem.) at 16, goes too far. The issue is not whether "FTE controls documents *across the entire Russian government*." FTE Mem. at 12 (emphasis added), or whether "FTE has the practical ability to obtain documents *throughout the Russian government* or even across the 27 ministries, agencies, and other governmental entities SPI has identified," *id*. (emphasis added). It is undisputed that "the Charter of FTE does not grant to FTE any powers that would allow it to compel Russian state authorities to disclose any relevant documents or information," Declaration of Olga Krivelskaya, ¶25.

Even where a government agency, by reason of having initiated a claim in a foreign jurisdiction, has been compelled to produce certain documents, it is not "obligated to produce discoverable information from *all other* government agencies." *United States v. Novartis Pharm Corp.*, 2014 WL 6655703, at *9 (S.D.N.Y. Nov. 24, 2014 (emphasis added); *accord United States v. Am. Express Co.*, 2011 WL 13073683, at 2–4 (E.D.N.Y. July 29, 2011); *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 263–86 (N.D.N.Y. 2006). Such agency may be compelled to produce documents from a smaller universe than the entire government. See *Compagnie Francaise* where the court in fact ordered discovery from only two government ministries, see 105 F.R.D. at 34–35, notwithstanding the broad language used in the decision.

The narrower and more focused questions here are, first, whether, by the Assignment, the Russian Federation sufficiently divested itself of an ownership or control interest of FTE such that FTE, as the Plaintiff in this action, should be considered as legally separate from the Russian Federation; and, second, whether such Assignment insulated the several agencies and entities of the Russian Federation, which oversee FTE's activities and existence, including the initiation and conduct of this litigation, from the legal responsibility to produce responsive documents from their files and archives, which expert opinions strongly suggest should still be extant.

On the first point, FTE appears to concede that "FTE's supervisory agencies would be able to prevent FTE from selling the Marks to a third party without having obtained prior consent" and that it may not alienate or dispose of property absent consent from "the federal executive authorities which perform the functions of founder of the Enterprise," namely, the executive authorities entrusted with supervising FTE, Rosalcohol and the Federal Agency for State Property Management, see Semenova Decl. (Dkt. 215) ¶¶ 44–46. Supp. Rose Decl., Ex. E at 27 (¶ 17). Thus, for all practical purposes, FTE is not the master of its own ship – it is responsible to at least two other organs of the Russian Federation.

Second, I find that an assignment effective under the Lanham Act, even if it is couched in terms of transferring the Russian Federation's "entire right, title, and interest in and to the Trademarks" and "expressly relinquishes any and all right, title and interest" in the Marks, Supplemental Declaration of Jessica A. Rose, Ex. B at 3, is not the same as full, complete, and independent ownership and existence, where, as here, the agencies and entities, acting for the assignor, fundamentally control this litigation and, if it is successful, retain the fundamental ability to unwind the Assignment at the end of the Assignment's useful life, regain control of the Trademark, and terminate, or at least materially alter, the existence of FTE.

FTE still does have the kind of relationship and affiliation with a limited number of entities within the Russian Federation -- Rosalcohol, the Ministry of Agriculture, the Ministry of Property Relations of the Russian Federation, the Russian agency on patents and trade marks, the Federal Agency for State Property Management, the Apparatus, and Administration of the President – such that, as the agent of these entities, FTE can be compelled to seek additional responsive documents from them.

I am not persuaded by the argument that the Russian Federation does not control the destiny of the Trademarks because the Russian government bodies have no authority to engage in commercial activities directly, which is why it was necessary to form a state enterprise to perform commercial activities involving the Marks, see Semenova Decl. ¶ 6; Krivelskaya Rpt. ¶ 16. The Russian Federation need not dissolve FTE to regain the control of the Marks, and obtain the benefits thereof, although the Russian Federation could, in fact, dissolve FTE. All the Russian Federation would have to do is create another federal treasury unitary enterprise to hold the Trademark and the State would derive the direct benefits thereof.

Here, while there may well be operational distinctions between how FTE relates to the Russian Federation as opposed to how, for example, the Civil Aeronautics Board or the Securities and Exchange Commission relate to the Executive Branch of the United States government, the fundamental and inescapable fact is that, in every practical way that matters in the commercial world, the Russian Federation ultimately controls the destiny of FTE, and, as a consequence, controls the disposition of the asset that is at the heart of this litigation, the Stolichnaya Trademark. It would be unfair and prejudicial to Defendants to do other than compel FTE to seek all relevant discovery of documents from the agencies and entities within the

Russian Federation with which it is so closely identified. *Compagnie Francaise*, at 34; *In re Uranium Antitrust Litigation*, at 1145; *Ghana Supply Commission v. New England Power Co*., 83 F.R.D. 586 (D.Mass.1979).

The Second Circuit's decision that upheld FTE's standing to sue under the Latham Act, *FTE III*, at 743, does not dictate a different result. Nothing the Second Circuit held bears directly on the question of whether FTE, as the assignee, still maintains that kind of a relationship with certain agencies and entities that are part of the Russian Federation that allows the Russian Federation to have control over FTE's conduct of this litigation, its commercial present and future, and an economic and legal interest in the Marks in the future.

In addition to the aforesaid entities and agencies, Defendants also seek an order compelling FTE to produce documents from the law enforcement agencies of the Russian Federation. The history here, however, reflects that law enforcement agencies voluntarily turned over 400 documents in this case, Rose Decl. ¶8, and previously made available over 19,000 documents from the Sorochkin investigative file. Hummel Decl., Ex. 16 ¶¶9, 13-16; Rose Decl. ¶9. It appears that there may be another 15,000 pages of documents seized in 1999 and 2000, but there is nothing in the record to suggest what these documents may be or how they may be relevant. In any case, unlike the agencies and entities described above, there has been no showing that FTE has any form of working or supervisory relationship with the law enforcement agencies. Indeed, with respect to the Prosecutor's Office of the Russian Federation, it "exercises its powers independently of federal and state authorities." Krivilskaya ¶26. To the extent Defendants' motions to compel addresses such law enforcement agencies, the motions are denied.

 3. The Documents Sought are Relevant to The Claims and
  Defenses and Proportional to The Needs of The Case

Under the Federal Rules of Civil Procedure, Rule 26(b)(1), a party "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." SPI argues it has met the requirements of proportionality and relevance, and I agree. Indeed, in my Order of December 6, 2016, I effectively already found the Requests to be relevant. (Dkt. 193 2-3).

In that Order, I set forth a detailed description of nine separate categories into which the 46-pages of SPI's Requests could be divided:
  I.      VVO-SPI to VAO-SPI transformation (3 items);
  II.     VVO-SPI debts inherited by VAO-SPI (2 items);
  III.    Russian Federation recognition of VAO-SPI's and its successors' rights in the
          trademarks (6 items);

IV. 1994 Restoration of the marks in the name of VAO-SPI, following 1991 cancellation (15 items);

V. Alleged continued existence of VVO-SPI from Jan. 20, 1992 to June 2001 (8 items);

VI. Russian Federation efforts to restore ownership and control over the Marks to the State (17 items);

VII. Russian Federation: Chain of purported title, including assignment to FTE (3 items, including seven (7) specific Orders of the Russian Federation by date and fifteen (15) specific Decrees of Russian Federation by date);

VIII. Russian Federation cooperation and collaboration with VAO- SPI and its successors (10 items); and

IX. The Russian Federation's or FTE's alleged injuries (1 item).

As for Defendant Grant, its Requests can be divided, analytically, into three categories:

I. Supposed efforts by VVO-SPI to supply PepsiCo with STOLICHNAYA products for sale in the United States and exercise "quality control" over those products during the years 1992 to 2000 (4 items);

II. Supposed efforts by VVO-SPI or the Russian Federation to supply STOLICHNAYA products to one or more third parties and exercise "quality control" during the post-PepsiCo years (2001 to 2013) (2 items); and

III. Any actions allegedly taken by VVO-SPI or the Russian Federation to maintain the STOLICHNAYA Registrations at the U.S. Trademark Office (11 items).

As Magistrate Judge Pittman stated in *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016), "As set forth in the text of Rule 26(b)(1), multiple factors are relevant in assessing proportionality, and some cases may require a detailed balancing of these factors and the making of fine distinctions. This, however, is not such a case."

From the descriptions of the various categories into which both Defendants' Requests fit, it is self-evident that both proportionality to the needs of the case and relevance have been adequately shown.

Accordingly, I grant the motions of Defendants SPI and Grant to compel FTE to seek and produce responsive documents in the foregoing categories from each of the following entities within 45 days of the date of this Order:

• Federal Agency for the Management of State Property (also referred to as the Federal Agency for State Property Management);
• Rosalcohol;
• the Ministry of Agriculture;
• the Ministry of Property Relations of the Russian Federation;
• the Russian agency on patents and trade marks;
• the Apparatus; and
• Administration of the President.

Given the close working relationship that FTE has with such entities, such a time period should not be burdensome to FTE to meet. Indeed, as discussed below, a short time period within which to produce the missing documents would work in FTE's interests to continue moving this case forward to completion of discovery and closer to trial.

<u>MOTION TO STAY</u>

Defendants SPI and Grant move, under Rule 26(c), to stay discovery "for good cause shown." They contend that a stay is appropriate here because each has not received what each regards as a complete production of documents by FTE. The Defendants contend that they have been prejudiced by the lack of complete production and argues as well that FTE will suffer no prejudice by a stay during which additional documents will be searched for and produced.

In opposition, Plaintiff FTE argues that the case is already old and deals with incidents occurring twenty-five or more years ago, with witnesses who are aging and may not be available when discovery is resumed. However real these problems, they are not of Defendants' making but rather are the unique result of the strategy the Russian Federation and FTE have adopted in this case. Ironically, FTE could well influence the potential length of the delay by expediting its production of documents that are dealt with in the motions to compel and meeting, if not exceeding, the time period in which I have ordered such production to occur.

Accordingly, I grant defendant SPI's and defendant Grant's motions to stay all discovery for 45 days from the date of this Order or until the completion of the aforesaid discovery by FTE, whichever is longer. If no responsive documents are found with respect to any of the Defendants' Requests, I further grant the application to direct FTE to certify that no responsive documents exist.

The foregoing constitutes the Order with respect to the outstanding issues in the SPI and Grant Defendants' Motions to Compel and Motions to Stay.

Dated: New York, New York
       November 9, 2017

 

David M. Brodsky
Discovery Master